THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. HARRY DRAVILLES, Plaintiff in Error.

*Opinion filed April 23, 1926—Rehearing denied June 4, 1926.*

1. CRIMINAL LAW—*indictment need not allege overt act constituting assault with intent to rape.* An indictment charging an assault with intent to rape need not allege any overt act constituting the assault, as a battery is not an essential part of the crime, but acts done by the defendant in pursuance of the assault are admissible in evidence for the purpose of characterizing the intent.

2. SAME—*indictment for assault with intent to rape need not allege prosecutrix was not wife of accused.* An indictment charging an assault with intent to rape need not allege that the person assaulted was not the wife of the accused, as the statute requires no such allegation except in case of statutory rape.

3. SAME—*when verdict is not void for failure to fix penalty— Parole act.* A verdict of guilty of the crime of assault with intent to commit rape is not erroneous because it provides confinement in the penitentiary for a term of years not to exceed the maximum term fixed by statute, as section 2 of the Parole act provides for a general sentence of imprisonment without fixing the duration of the term; and where the verdict finds the defendant to be of the age of eighteen years it is not error to sentence the defendant to the penitentiary instead of to the reformatory, as section 3 of said act makes that matter discretionary with the trial judge.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. EMANUEL ELLER, Judge, presiding.

W. G. ANDERSON, GEORGE J. SPATUZZA, and G. A. KYRIAKOPULOS, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Harry Dravilles was tried in the criminal court of Cook county upon an indictment of one count charging that on November 14, 1924, in Cook county, he "then and there being a male person of the age of sixteen years and upwards, did unlawfully and feloniously make an assault upon one Ivy McRae then and there being a female, with intent then and there feloniously and forcibly to ravish and carnally know the said Ivy McRae against her will, contrary to the statute." The jury returned a verdict finding him guilty in manner and form as charged in the indictment and that he was of about the age of eighteen years. He was sentenced under this verdict to confinement in the penitentiary at Joliet for a term of years not to exceed the maximum term fixed by the statute, and he has sued out a writ of error.

The plaintiff in error contends that the court erred in overruling his motion to quash the indictment because it alleges merely an assault with the intent charged and contains no allegation of any overt act constituting the assault. An assault is defined in the Criminal Code as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The section under which the indictment was found provides that an assault with intent to commit rape shall subject the offender to imprisonment in the penitentiary for a term not less than one year nor more than fourteen years. A battery is not an essential part of the crime. It may be important on the trial as tending to show the intent with which the assault was committed, but an assault with the intent mentioned in the statute constitutes the crime whether an actual battery or unlawful beating occurs or not. The acts done by the defendant in pursuance of the assault are admissible in evidence for the purpose of characterizing the intent.

Another objection to the indictment is that the allegation that the person assaulted was not the wife of the person charged is essential to the charge. It has been decided to the contrary in *People* v. *Stowers,* 254 Ill. 588, which holds that at common law it is not necessary for the indictment to aver that the female was not the wife of the accused, and it is not made necessary by the statute to do so except where the indictment is under the second clause of the act, which refers to carnal knowledge of any female under the age of sixteen years, not the wife of the accused, either with or without her consent, and that an indictment for forcible rape need not contain such allegation.

It is contended that the evidence does not establish, beyond a reasonable doubt, the intent of the defendant to have carnal knowledge of the prosecuting witness notwithstanding any resistance she might make. The prosecuting witness was a married woman twenty-three years old, living with her husband and father and mother on the second floor of a flat-building owned by her father. The plaintiff in error is a Greek, who has been in America about five years. He was a peddler of fruit and vegetables from a wagon which he drove from house to house. He called at the house where the prosecuting witness lived on November 11 and sold Mrs. Shaeffer, her mother, some potatoes, and called again on the morning of November 14 and sold her some bananas, for which she paid, but he did not have the bananas with him and went to his wagon in the alley to get them. On his return Mrs. Shaeffer had left the house, and her daughter, Mrs. McRae, was alone in the flat. The plaintiff in error came in through the back door into the kitchen. Mrs. McRae testified that she was in the front room using the vacuum cleaner. She was wearing corduroy "knickers," a blue blouse, shoes and stockings and an old hat. There was a swinging door between the kitchen and the dining room where Mrs. McRae was, and a bedroom next to the dining room. The plaintiff in error said

something in the kitchen which Mrs. McRae did not understand, so she stopped the cleaner and went to the kitchen. The plaintiff in error was standing by the door. She testified that he started to talk about some bananas that her mother had told him her sister would buy and he wanted to know where she lived. Mrs. McRae started to tell him, and then he said to her, "You are very young and every time I come up here you are working." At that she testified she was a little nervous, and then he asked her if she was going to school, and she said she had been out of school for some time. After that he seized her hand, and she told him to leave her alone,—not to do that. He then seized her by the breasts. They struggled and she kept telling him not to do anything, but he "grabbed" her, took her into the bed-room, threw her on the bed and fell on top of her. He tried to get her knickers off and succeeded in getting the belt unfastened, but the knickers were buttoned on the side. He then raised himself up and tried to get his clothes open, but she got a good chance when he raised himself up and kicked him. Then she got up and ran out of the front door. She screamed and ran through the parlor and down the front stairs. He kept calling her to come back and he would give her anything she wanted and he loved her. Her sister-in-law lived next door, on the first floor. She went in the front way and rang the bell but could not make her hear. She then came out and ran through the passageway between the buildings. When she got to the rear of the buildings she saw the milkman. Her blouse was torn down off the shoulder, her belt was unfastened, she had marks on her arms, which later turned black and blue, and scratches on her right arm, and was crying. Her sister-in-law came down while she was talking with the milkman. She went in to her sister-in-law's home and sat down in a chair, and in about a half hour her father came in and she went back to her home. She described the defendant to the milkman. The police came,

and she went with them and the milkman in an automobile to where the milkman directed, at Monticello and Ferdinand streets, where they found the defendant coming out of an alley, leading his horse. She told the officers that was the man and told them what he had done.

Mrs. Caroline Shaeffer, the prosecuting witness' sister-in-law, testified that on the morning of November 14, 1924, she was in her kitchen, next door to Mrs. McRae's home, on the first floor, when she heard screams in a female voice. She went out on her back porch and listened and discovered they came from the second floor. She then went into her kitchen, turned off the gas from some things she had cooking, grabbed a sweater, ran up-stairs, and finding the back door open, stepped in. Not seeing anyone she called Ivy, went through, looked in the bed-room and saw that it was out of order. The dressing table was pulled out from the wall toward the center of the room, the dresser scarf was pulled partly off, and the bed looked as if it had been tramped on by dirty shoes,—was very much mussed up and dirty. She walked through the dining room to the front hall, saw that there was no one at home, then went back to her own kitchen, and as she entered it, hearing voices in the passageway, she walked back and found Mrs. McRae talking with the milkman. She was crying. She had on a pair of knickers and a blouse, which was ripped down the shoulder seam and partly off her shoulder. She took Mrs. McRae into her home and there noticed bruises upon her arms. She was red across the breasts and arms and had scratches on her arms and prints showing. About three days afterward Mrs. Shaeffer observed Mrs. McRae's breasts and arms again. They were bruised and were black and blue and green.

Harry P. Littlefield, the milkman, testified as to Mrs. McRae's coming down the passageway between the houses, crying, with her blouse down, her arms and neck scratched, finger-prints showing on her neck and her belt broken.

Mrs. McRae described the man to him, and about two hours afterward Littlefield saw him at Homan avenue and Fulton street. He went back to the Shaeffer home and found two police officers there, who asked him to step in the machine and go to the spot where he saw the peddler. He got in with Mrs. McRae, but they did not find the defendant at the place where Littlefield had seen him but saw him about four blocks further, leading his horse out of the alley. The defendant was arrested and taken to the police station.

The defendant testified to going up-stairs to deliver the bananas which he had sold to Mrs. Shaeffer and seeing the prosecuting witness there; that he told her it was kind of cold to-day, and she said, "If you are cold you can stay and get warm." So he stayed and said to her, "You are all the time working," and she said she was doing some more housecleaning. He asked her if she went to school, and said she looked very young and she ought to go to school. She said, "You look younger than I do." Then she said that she thought he was about seventeen or eighteen and she was older than that,—she was over twenty-one. He said that he would not take her to be over seventeen or eighteen, and then he took hold of her hand. She was laughing when he took her hand, so he tried to kiss her, and sometime they were about by one bed-room door, and he told her, "Let's sit over here," and as he said that he was holding her hands, and she dropped and fell, and when he saw her fall he was so excited he tried to pick her up, and when he picked her up she slipped from his hands and screamed. So he took her and put her on the bed, and she got up and he walked out and went down-stairs and went on selling potatoes, the same as usual. He took hold of her hand and kissed her. She did not object. He did not at any time lie on top of her, unfasten her belt or unbutton her waist. She did not kick him and he did not attempt

to have sexual intercourse with her. As soon as she said, "Get out," he got out. He was asked if he told the officers he was on top of her on the bed, and answered that he did not.

Two witnesses testified to the defendant's good reputation. Andrew J. Carroll, one of the officers who made the arrest, in rebuttal testified that the defendant, in talking to him in the Warren avenue station, said he was in bed with the prosecuting witness and on top of her.

The intent of the defendant was a question of fact, to be determined by the jury from a consideration of all the evidence in the case. It cannot be said from this evidence that there is clearly a reasonable doubt of the defendant's guilt. On the contrary, the jury was amply justified, from a consideration of the evidence of the prosecuting witness, corroborated as it is by testimony of her sister-in-law and the milkman and the circumstances in the case, in concluding that the defendant made the assault with the intent charged in the indictment.

It is contended that the State's attorney was guilty of improper conduct in asking improper questions, which were prejudicial to the plaintiff in error, in the course of his cross-examination, and in asking leading questions of the prosecuting witness. All objections made to any of the questions mentioned in the brief were promptly sustained, and the questions were not of such a character that the mere asking of them could have done the defendant any harm.

It is contended that the verdict is void because it failed to fix the punishment, and that it was error for the court to sentence the plaintiff in error to the penitentiary and not to the reformatory. The penalty fixed by the statute for an assault with intent to commit rape is imprisonment in the penitentiary for a term not less than one year nor more than fourteen years. Section 2 of the Parole act provides

that in such case the court shall not fix the duration of the term but that the sentence shall be a general sentence of imprisonment, and section 3 makes it discretionary with the trial judge whether the sentence shall be to the penitentiary or the reformatory.

The judgment is affirmed.          *Judgment affirmed.*